UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

HYDROXYL SYSTEMS, INC. and
INFILCO DEGREMONT, INC.,

Plaintiffs,

vs.

ANOXKALDNES GLOBAL A.B.,
ANOXKALDNES, INC. and
MICHAEL JOHNS,

Defendants.

Case No.: CA 07 399 ML

## COMPLAINT

Plaintiffs Hydroxyl Systems, Inc. ("Hydroxyl") and Infilco Degremont, Inc. ("IDI") as and for their Complaint against AnoxKaldnes Global A.B., AnoxKaldnes, Inc. (collectively, "AnoxKaldnes") and Michael Johns ("Johns"), allege as follows:

## NATURE OF ACTION

1. This action arises from the decision of defendant Johns, a former key Hydroxyl employee, and Hydroxyl's competitor AnoxKaldnes, Inc. (acting in concert with its parent company AnoxKaldnes Global A.B.) to engage in a campaign to deliberately disrupt the business of Hydroxyl and IDI, through the misappropriation of Hydroxyl's and IDI's trade secrets and confidential customer and sales information. First, AnoxKaldnes, Inc. hired Johns and induced him to violate his contractual and fiduciary duties to Hydroxyl. Then, AnoxKaldnes used Hydroxyl's and IDI's confidential information and trade secrets to improperly solicit customers of Hydroxyl and IDI and tortiously interfere with Plaintiffs' existing and prospective business relationships.

2. Plaintiffs seek permanent injunctive relief to bar AnoxKaldnes and Johns from continuing to use or disclose confidential, proprietary and trade secret information belonging to Hydroxyl and IDI. Defendants' misappropriation of this valuable information has caused and, unless restrained and enjoined by this Court, will continue to cause irreparable injury to Plaintiffs' business, customer relationships and good will.

3. Plaintiffs also seek monetary damages from Defendants to compensate them for their injuries, to punish Defendants for their wrongful conduct and to encourage Defendants to refrain from similarly wrongful conduct in the future.

## THE PARTIES

### Plaintiffs

4. Plaintiff Hydroxyl is a corporation organized and existing pursuant to the laws of British Columbia, Canada, with its principal offices in British Columbia. It is in the business of designing, manufacturing and distributing water and wastewater treatment systems world-wide, including in North America.

5. Plaintiff IDI is a corporation organized and existing pursuant to the laws of New York, with its principal offices in Virginia. It is in the business of designing, engineering, manufacturing, commissioning and servicing water and wastewater treatment systems world-wide, including in North America.

### Defendants

6. Defendant AnoxKaldnes, Inc. is a corporation organized and existing pursuant to the laws of Rhode Island, with its principal office in Providence, Rhode Island. AnoxKaldnes, Inc. is an international provider of municipal and industrial wastewater treatment systems.

7. Defendant AnoxKaldnes Global A.B. is a corporation organized and existing pursuant to the laws of Sweden with its principal office in Lund, Sweden. AnoxKaldnes Global

A.B. is the corporate parent of a group of companies including AnoxKaldnes, Inc., and directs the strategic decisions of those companies.

8. Upon information and belief, at all times mentioned herein, Defendant AnoxKaldnes, Inc. functioned as the agent, servant and alter ego of Defendant AnoxKaldnes Global A.B. AnoxKaldnes Global A.B. actively controls and directs AnoxKaldnes, Inc. and controlled and directed the unlawful actions at issue herein. All of the things alleged to have been done by Defendants were done in the capacity, scope and course of their alter ego relationship and can be ascribed equally to each Defendant through that alter ego relationship.

9. Defendant Michael Johns is a natural person who resides in Rhode Island.

## JURISDICTION AND VENUE

10. This Court has jurisdiction based on diversity of citizenship, pursuant to 28 U.S.C. § 1332, in that no Plaintiff shares common state citizenship with any Defendant and the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

11. Each defendant has sufficient contacts with the State of Rhode Island to subject it to personal jurisdiction in this Court.

12. Venue lies in this district under 28 U.S.C. § 1391(b). Defendant AnoxKaldnes, Inc. is a resident of and does substantial business in this District, and a substantial part of the events giving rise to the claims for relief occurred in this District.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS

### Hydroxyl's Employment Of Michael Johns

13. For over ten years, Hydroxyl has provided high-technology environmental systems that protect sensitive aquatic and coastal environments around the world. Industrial, municipal and marine markets seek Hydroxyl's specialized products for treatment of wastewater prior to discharge to sewer systems, rivers, lakes or oceans. Through its business activities,

Hydroxyl assists its clients in minimizing the environmental impact of their business operations worldwide. Hydroxyl services a diverse array of industries including food and beverage, shipboard, chemical, municipal, commercial, institutional, remediation and waste management market sectors. With experience across these markets, Hydroxyl has developed a proven suite of products, processes and services for a variety of demanding applications around the world.

14. Hydroxyl operates in a market in which relatively few companies compete fiercely with one another for competent employees and customers. Hydroxyl relies heavily on the specialized training, skills and knowledge of its employees, particularly those who: have received extensive training; have been with Hydroxyl for some time; are top producers; have demonstrated commitment, reliability and loyalty; serve in a managerial capacity; and/or are otherwise key to Hydroxyl's operation and success.

15. Hydroxyl employed Johns on May 25, 1999, as a Project-Manager. On January 1, 2006, Johns was promoted to Director of Sales for Hydroxyl.

16. As Project Manager for almost 7 years, Johns served as the primary contact for many of Hydroxyl's clients, consulting with them on their wastewater issues, responding to their questions and inquiries seeking additional services, contributing to designs and drawings for industrial process as well as financial and feasibility assessments and subsequent proposals. He became well versed in the technical background of all of Hydroxyl's proprietary products and processes and was a key player in their design and implementation. He was involved in every aspect -- technical, financial and marketing – of each product in his division. He also served as back-up project manager for other project managers at Hydroxyl and therefore had knowledge of their areas as well.

17. As Director of Sales, Johns was responsible for all proposals and bids; managing project deadlines; developing accurate methods of estimating the cost and length of customer projects; ensuring smooth functioning among the sales, supply chain and engineering groups; identifying new projects and processes to keep Hydroxyl competitive; and keeping abreast of old and new competitors and their impact on Hydroxyl. He had intimate access to the specifications of all technology owned or operated by Hydroxyl; its marketing practices; all existing and prospective clients and business opportunities; Hydroxyl's design and implementation techniques; its costing and pricing techniques and other information Hydroxyl relies upon in developing competitive bids.

18. Johns was the only Director of Sales for Hydroxyl until his resignation. He occupied a senior management role, and his duties provided him access to information concerning Hydroxyl's worldwide business. By virtue of his position in senior management, Johns had fiduciary duties to Hydroxyl.

19. Johns supervised business for Hydroxyl in North America, and was involved in and responsible for any and all new business proposals and bids.

20. Johns entered into an Inventions, Patents and Confidentiality Agreement (the "Agreement") with Hydroxyl, dated December 5, 2000. The Agreement was a condition of his continued employment and is valid, in force and enforceable.

21. The Agreement noted that "[i]n the course of employment with the Company, the Employee will necessarily be exposed to and acquire all manner and type of in-house information of the Company including, but not limited to, information directly or indirectly pertaining to the Company itself; the business of the Company; the Inventions; the Company's apparatus, techniques, product concepts, product design, specifications, research discoveries and

patent opportunities; materials and sources of supply thereof; contracts and costing information in respect of the products and services provided or that may be provided by the Company; the Company's customers including their identities, requirements and personnel; and financial information regarding the Company's business."

22. In signing the Agreement, Johns consented to the following requirement: "Except for the purposes connected with the Employee's employment with the Company, the Employee shall not, directly or indirectly disclose or use, at any time, either during or subsequent to his or her employment, any Confidential Information or any trade secret concerning the Company's plans, policies and intentions, including matters though not technically trade secrets, the dissemination of knowledge whereof might prove prejudicial to the Company." Further, Johns agreed that "[t]he Employee shall not (except as may be required to enable him to discharge his duties hereunder) during or at any time after the term of this Agreement, disclose any of such confidential information or trade secrets to any person, firm or corporation, or utilize any of such confidential information or trade secrets for any purpose whatsoever."

23. Finally, Johns accepted the following non-compete covenant: "During the term of this Agreement, or within two (2) years thereafter in any geographical area in which duties have at any time been assigned to him or her hereunder during this Agreement engage (as an individual or as a stockholder, trustee, partner, financier, agent, consultant, employee or representative of any person, firm, corporation or association), or have any interest, either direct or indirect, in any business in competition with the business of the Company; nor call on any of the Company's current customers. . . ."

Hydroxyl's Confidential Customer and Business Information

24. The wastewater treatment market is a highly competitive market in which the number of potential customers is limited. Therefore, once Hydroxyl makes contact with a potential customer either through an existing relationship or general marketing, Hydroxyl takes every precaution to preserve and maintain the confidentiality of the information it gains concerning the potential customer, both to protect the customer's privacy interests and to protect Hydroxyl's proprietary rights.

25. Hydroxyl has invested substantial time and funds, over a period of many years, to develop various formulas, compilations, methods, techniques and processes utilized by Hydroxyl to evaluate wastewater situations and to make recommendations, including without limitation, pricing and costing analyses, design and engineering presentations and risk analyses.

26. The foregoing information, including customer lists, company marketing plans, company financial information, company business methodologies and computer information, information produced in support of project presentations and related dialogue with any party, files, pending customer presentations and prior presentations, pricing and costing models and formulas, and Hydroxyl's business plans and marketing documents, are all important aspects of Hydroxyl's business that are not available publicly and are maintained as confidentially and privately as possible within Hydroxyl's offices.

27. At all relevant times, Hydroxyl has undertaken, and does undertake, reasonable efforts to maintain the confidentiality and secrecy of its confidential information and trade secrets.

Confidential Information Arising Out Of Hydroxyl's Collaboration With IDI

28. IDI is the exclusive United States distributor for certain Hydroxyl products pursuant to a License and Distribution Agreement, dated August 3, 2005.

29. Hydroxyl works closely with IDI on bidding and installation for large-scale municipal projects throughout the United States.

30. Johns was extensively involved in the Hydroxyl-IDI relationship and, as such, became privy to various confidential and proprietary information, including without limitation, pricing and costing information and analyses, design and engineering methodologies and processes. Such information constitutes an important aspect of IDI's business that is not generally known or readily ascertainable, not available publicly and is maintained as confidentially and privately as possible.

31. IDI's confidential information was disclosed to Johns in confidence and under circumstances intended to preserve the secrecy of the information. At all relevant times, IDI has undertaken, and does undertake, reasonable efforts to maintain the confidentiality and secrecy of its trade secrets and its confidential and proprietary information.

Johns' Resignation

32. By a letter dated February 20, 2007, Johns abruptly tendered his resignation. His letter stated that he was leaving Hydroxyl to evaluate his current goals and investigate new opportunities.

33. During a conversation with Hydroxyl's Chief Executive Officer, Carolyn Rogers, Johns confirmed that the purpose of his resignation was not to enable him to seek employment with any competitors of Hydroxyl or IDI, specifically including AnoxKaldnes Global A.B., or its affiliates, including its wholly owned North American subsidiary AnoxKaldnes, Inc.

AnoxKaldnes, Inc. is Hydroxyl's principal competitor in the wastewater treatment system market and shares a substantially identical base of prospective customers.

34. Immediately after his resignation from Hydroxyl, however, Johns began working for AnoxKaldnes as an employee and continues to work for AnoxKaldnes. Johns' title and duties at AnoxKaldnes are comparable to those that he held at Hydroxyl. In the course of such work, Johns has been in contact with prospective customers of Hydroxyl and/or IDI for the purpose of persuading such customers to do business with AnoxKaldnes instead of with Hydroxyl and/or IDI.

35. At the time of Johns' resignation, Hydroxyl and IDI were in negotiations with at least three new potential customers for projects that would have represented a significant amount of income to Hydroxyl and IDI. Johns was a key part of the Hydroxyl-IDI project team in each of these negotiations, and his name and resume were provided to each potential customer to demonstrate the level of expertise Hydroxyl and IDI could provide. Johns was aware of and involved in Hydroxyl's pricing for each of these negotiations, and Johns had knowledge of IDI's pricing and design proposals for each of these negotiations. Upon information and belief, Johns has since been involved in soliciting these same accounts for AnoxKaldnes and visited the potential clients as a representative of AnoxKaldnes. Each of these new potential customers elected to give its business to Johns and AnoxKaldnes.

36. There are several additional potential projects in which Johns was heavily involved that are still being negotiated. On information and belief, Johns and AnoxKaldnes are targeting those projects as well and will use Hydroxyl's and IDI's confidential information against Hydroxyl and IDI if not prevented from doing so.

37. Defendants' use of Hydroxyl's information against it in the bidding process threatens not only Hydroxyl's relationship with prospective customers but also the lucrative and heretofore successful relationship between Hydroxyl and IDI.

Defendants' Conspiracy To Misappropriate
Trade Secrets And Hire Away Hydroxyl's Employee

38. Upon information and belief, while Johns was still employed as a senior manager of Hydroxyl, Johns and AnoxKaldnes conspired and agreed among themselves to improve their prospects of future competition against Hydroxyl and IDI by taking Johns' knowledge of Hydroxyl's and IDI's confidential information and trade secrets and using that information to compete directly against Hydroxyl.

39. Upon information and belief, while Johns was still employed by Hydroxyl, he conspired with AnoxKaldnes to deliberately disrupt Hydroxyl's and IDI's business through the misappropriation and misuse of Hydroxyl's and IDI's confidential information and to solicit customers of Hydroxyl and IDI. The purpose of Defendants' campaign was two-fold: to misappropriate the key employee, customer information and business opportunities necessary for AnoxKaldnes to gain all of the competitive advantages of Hydroxyl's and IDI's business without paying for it; and to deliberately disrupt Hydroxyl's and IDI's business.

40. On information and belief, AnoxKaldnes had no North American presence prior to 2001, when its predecessor, Kaldnes North America first opened an office in North America. AnoxKaldnes' marketing material states that "The operation in North America is under [sic] rapidly growing and the market potential in USA and Canada is estimated to be very large."[1] Upon information and belief, prior to hiring Johns, AnoxKaldnes' North American presence was

---

[1] *See* All About Us, http://www.anoxkaldnes.com/Eng/c0companyc0/organisation.htm (last visited October 25, 2007).

not growing as quickly as it intended, and was lacking in strong leaders, employees and customers.

41. At all times relevant hereto, Defendants knew the value of Hydroxyl's and IDI's confidential information and trade secrets, and the value of Hydroxyl's Director of Sales. Further, at all relevant times Defendants knew that, but for engaging in their unfair business practices, Defendants could not have assembled detailed knowledge of Hydroxyl's customers and prospective customers. Upon information and belief, that Defendants' purpose in hiring Johns was to obtain his knowledge and access to Hydroxyl's and IDI's proprietary information, to misappropriate Hydroxyl's and IDI's confidential information and to solicit Hydroxyl's and IDI's existing customers.

42. Defendants' coordination of the resignation of Hydroxyl's Director of Sales had, and continues to have, an adverse impact on the operations of Hydroxyl and IDI and has materially injured Hydroxyl's and IDI's relations with their customers.

<u>Damages And Irreparable Harm Resulting From Defendants' Conduct</u>

43. As a direct result of AnoxKaldnes' solicitation of Hydroxyl's and IDI's customers and Hydroxyl's Director of Sales, Hydroxyl and IDI have been injured and will likely continue to be injured, are likely to have suffered and to continue to suffer harm to their good will and reputation in the community, and to incur additional consequential damages.

44. As a result of Defendants' misappropriation, for their own benefit, of Hydroxyl's and IDI's confidential information, Hydroxyl and IDI have been irreparably harmed, as they have lost valuable trade secrets and proprietary information, as well as the competitive advantage such information provided.

45. As a result of Defendants' wrongful acts, Hydroxyl and IDI have been irreparably harmed, as they have lost experience, expertise and indicia of competence and success necessary to assure future customers and obtain future business to new customers.

46. Defendants have benefited from their improper activities by realizing revenue and profit that belong to Hydroxyl and IDI.

**FIRST CLAIM**

**Breach of Contract**
**(by Hydroxyl against Johns)**

47. Hydroxyl repeats and realleges each and every allegation set forth in paragraphs 1 through __, above, as though fully set forth at length.

48. Hydroxyl and Johns were parties to the Agreement, which is a valid and binding contract.

49. Hydroxyl substantially performed all of its obligations under the Agreement.

50. Johns breached the Agreement by *inter alia*: (i) improperly disclosing and/or using Hydroxyl's proprietary and confidential information and its trade secrets, and (ii) accepting employment with a competitor of Hydroxyl in a geographic area in which he had performed work for Hydroxyl within two years of the termination of his employment with Hydroxyl.

51. As a result of Johns' breaches of the Agreement, Hydroxyl has suffered damages in an amount to be determined at trial.

**SECOND CLAIM**

**Misappropriation of Trade Secrets**
**(by Hydroxyl and IDI against all Defendants)**

52. Hydroxyl and IDI repeat and reallege each and every allegation set forth in paragraphs 1 through __, above, as though fully set forth at length.

53. During the period of his employment with Hydroxyl, Johns was entrusted with confidential and proprietary information, including the Confidential Information specified in his Agreement. This information constitutes protectible trade secrets used by Hydroxyl in its business and gives it a commercial advantage over its competitors. Defendants knew that this information was confidential and that it was considered by Hydroxyl to be a trade secret. They further knew and understood that this information was not to be revealed to others outside the company.

54. During the period of his employment with Hydroxyl, Johns was exposed to and entrusted with IDI's confidential and proprietary information. This information constitutes protectable trade secrets used by IDI in its business and give it a commercial advantage over its competitors. Defendants knew that this information was confidential and that it was considered by IDI to be a trade secret. They further knew and understood that this information was not to be revealed to others outside IDI or Hydroxyl.

55. When Johns left Hydroxyl, he took with him valuable trade secrets and confidential information belonging to both Hydroxyl and IDI which had been revealed to him in confidence and in trust while a high-ranking employee of Hydroxyl. Johns and AnoxKaldnes willfully and deliberately misappropriated Plaintiffs' confidential information with the full knowledge of the proprietary nature and commercial value of the information.

56. Hydroxyl's and IDI's trade secrets derive independent economic value from not being generally known to the public or to other persons who can obtain economic benefit from their disclosure.

57. Hydroxyl and IDI have made reasonable efforts under the circumstances to maintain the confidentiality of its trade secrets and confidential information.

58. Prior to their misappropriation by Defendants, the trade secrets gave Hydroxyl and IDI a significant competitive advantage over their competitors, including AnoxKaldnes. This advantage, as to AnoxKaldnes, has now been compromised as a result of Defendants' activities.

59. Defendants have used Hydroxyl's and IDI's confidential information without Hydroxyl's and IDI's consent and without regard to Hydroxyl's and IDI's rights, and without compensation, permission or licenses.

60. Defendants' conduct was, is and remains willful and wanton, and was taken with blatant disregard for Hydroxyl's and IDI's valid and enforceable rights.

61. As a direct and proximate result of Defendants' violation of state law and the breach of the Agreement with respect to the confidentiality of Hydroxyl's and IDI's confidential, proprietary and trade secret information, Hydroxyl and IDI have sustained substantial damages and Defendants have been unjustly enriched in amounts to be proven at trial.

62. Defendants' wrongful conduct has caused and, unless enjoined by this Court, will continue in the future to cause irreparable injury to Hydroxyl and IDI. Hydroxyl and IDI have no adequate remedy at law for such wrongs and injuries. Johns had an intimate knowledge of Hydroxyl's and IDI's confidential information and his new position with AnoxKaldnes results in direct competition between the products that Johns formerly supported and the new products for which he has responsibility.

## THIRD CLAIM

**Intentional Interference with Employment Contract**
**(by Hydroxyl against AnoxKaldnes Global A.B. and AnoxKaldnes, Inc.)**

63. Hydroxyl repeats and realleges each and every allegation set forth in paragraphs 1 through __, above, as though fully set forth at length.

64. At all relevant times up to and including the date of Johns' resignation from Hydroxyl, there existed between Hydroxyl and Johns a valid employment contract and a relationship that contained the probability of future economic benefit to Hydroxyl.

65. But for the conduct of AnoxKaldnes and their improper solicitation of Johns, that employment relationship would have continued and Hydroxyl would have continued to receive economic benefit therefrom.

66. AnoxKaldnes were aware of the employment relationship existing between Hydroxyl and Johns.

67. At all relevant times, AnoxKaldnes knew that Johns had a duty under the terms of his employment with Hydroxyl not to work for or assist any competitor of Hydroxyl, such as AnoxKaldnes, and not to disclose Hydroxyl's confidential information.

68. At all relevant times, AnoxKaldnes knew that Johns had a duty under his employment contract to protect Hydroxyl's confidential, proprietary and trade secret information and not to disclose that information to any competitor, including AnoxKaldnes.

69. Despite such knowledge, AnoxKaldnes intentionally solicited, induced and encouraged Johns to breach his employment contract with Hydroxyl.

70. AnoxKaldnes performed the aforementioned conduct knowingly, intentionally, and in conscious disregard of Hydroxyl's rights.

71. As a direct and proximate result of AnoxKaldnes' efforts and inducements, Johns did breach his employment contract with Hydroxyl.

72. As a result of said breach of the employment contract, Hydroxyl has suffered damages and will imminently suffer further damages, including the loss of its competitive position and lost profits, in an amount to be determined at trial.

**FOURTH CLAIM**

**Breach of Fiduciary Duty**
**(by Hydroxyl against Johns)**

73. Hydroxyl repeats and realleges each and every allegation set forth in paragraphs 1 through __, above, as though fully set forth at length.

74. Johns held a position of trust and confidence with Hydroxyl. In his position, he had access to and was entrusted with Hydroxyl's proprietary, confidential and trade secret information and the proprietary trade secret and the confidential information of IDI.

75. By virtue of his position as a Director of Sales, and pursuant to his employment agreement, Johns owed Hydroxyl certain fiduciary duties that included an obligation not to take any action that would be contrary to Hydroxyl's best interests or that would deprive Hydroxyl of any opportunities, profit or advantage which Johns might bring to Hydroxyl. Johns further owed Hydroxyl fiduciary duties not to utilize his relationship with Hydroxyl to his own advantage. These fiduciary duties also included the obligation of Johns not to use Hydroxyl's proprietary, confidential and trade secret information or the proprietary, confidential and trade secret information of Hydroxyl's exclusive United States distributor to divert business from Hydroxyl to himself or a competitor, and not to work on behalf of a competing business while still an employee of Hydroxyl.

76. Johns used his position of trust and confidence to further his own interests and the interests of AnoxKaldnes, and breached his fiduciary duties to Hydroxyl, by engaging in the acts alleged herein. As alleged above, Johns also breached the aforementioned duty by using Hydroxyl's property and resources for the benefit of, and to aid and assist himself personally and Hydroxyl's competitor AnoxKaldnes.

77. As a direct and proximate result of Johns' breach of his fiduciary duties, Hydroxyl has suffered injury and harm in an amount to be determined at trial.

**FIFTH CLAIM**

**Inducing Breach of Fiduciary Duty**
**(by Hydroxyl against AnoxKaldnes Global A.B. and AnoxKaldnes, Inc.)**

78. Hydroxyl repeats and realleges each and every allegation set forth in paragraphs 1 through __, above, as though fully set forth at length.

79. At all times herein mentioned, AnoxKaldnes knew that Johns held a highly sensitive position of trust and confidence at Hydroxyl. At all times herein mentioned, AnoxKaldnes knew that Johns owed a fiduciary duty to Hydroxyl not to take any action that would be contrary to Hydroxyl's best interests, including but not limited to taking Hydroxyl's confidential information, disclosing it to a competitor, and using it to unfairly compete with Hydroxyl and attempt to lure away Hydroxyl's customers.

80. Despite such knowledge, AnoxKaldnes intentionally and without justification solicited, induced and encouraged Johns to breach his fiduciary duties to Hydroxyl.

81. As a direct and proximate result of AnoxKaldnes' efforts and inducements, Johns did breach his fiduciary duties to Hydroxyl.

82. As a direct and proximate result of AnoxKaldnes' solicitation, inducement and encouragement to Johns to breach his fiduciary duties to Hydroxyl, Hydroxyl has incurred damages in an amount to be determined at trial.

83. In taking the aforesaid actions, AnoxKaldnes' acted with malice, fraud and oppression, and in conscious disregard of Hydroxyl's rights.

**SIXTH CLAIM**

**Breach of Duty of Loyalty**
**(by Hydroxyl against Johns)**

84. Hydroxyl repeats and realleges each and every allegation set forth in paragraphs 1 through __, above, as though fully set forth at length.

85. As an employee of Hydroxyl, Johns owed a duty of undivided loyalty to Hydroxyl. Pursuant to this duty of utmost good faith and loyalty, Johns could not compete with Hydroxyl or assist a competitor of Hydroxyl during his employment with Hydroxyl. Pursuant to this duty, Johns was required to always give preference to Hydroxyl's business over his own similar interests during the course of his employment with Hydroxyl.

86. Johns breached this duty of loyalty to Hydroxyl in that, while employed by Hydroxyl, he misappropriated Hydroxyl's confidential information and trade secrets and used Hydroxyl's property, resources, confidential information and trade secrets for the benefit of, and to aid and assist both himself personally and a competitor of Hydroxyl, AnoxKaldnes.

87. As a direct and proximate result of Johns' breach of his fiduciary duties, Hydroxyl has suffered injury and harm in an amount to be determined at trial.

## SEVENTH CLAIM

**Inducing Breach of Duty of Loyalty**
**(by Hydroxyl against AnoxKaldnes Global A.B. and AnoxKaldnes, Inc.)**

88. Hydroxyl repeats and realleges each and every allegation set forth in paragraphs 1 through __, above, as though fully set forth at length.

89. AnoxKaldnes knew that Johns was employed by Hydroxyl and, as an employee of Hydroxyl, owed a duty of loyalty to his employer. AnoxKaldnes knew that this duty included an obligation on the part of Johns not to compete with Hydroxyl or assist a competitor of Hydroxyl. AnoxKaldnes also knew Johns was required to always give preference to Hydroxyl's business over his own similar interests during the course of his employment with Hydroxyl.

90. Despite such knowledge, AnoxKaldnes intentionally and without justification solicited, induced and encouraged Johns to breach his duties of loyalty to Hydroxyl.

91. As a direct and proximate result of AnoxKaldnes' efforts and inducements, Johns did breach his duties of loyalty to Hydroxyl.

92. As a direct and proximate result of AnoxKaldnes' solicitation, inducement and encouragement to Johns to breach his duties of loyalty to Hydroxyl, Hydroxyl has suffered injury and is entitled to compensatory damages in an amount to be determined at trial.

93. In taking the aforesaid actions, AnoxKaldnes acted in conscious disregard of Hydroxyl's rights. Accordingly, Hydroxyl is entitled to recover exemplary damages from AnoxKaldnes in an amount to be determined at trial.

## EIGHTH CLAIM

**Intentional Interference With Prospective Contractual Relations**
**(by Hydroxyl and IDI against all Defendants)**

94. Hydroxyl and IDI repeat and reallege each and every allegation set forth in paragraphs 1 through ___, above, as though fully set forth at length.

95. At all relevant times there existed between Hydroxyl and IDI and their current and prospective customers business relationships that contained the probability of future economic benefit to Hydroxyl and IDI.

96. By virtue of Johns' position as Director of Sales and his access to Hydroxyl's and IDI's confidential information, Johns had knowledge of the relationships between Hydroxyl and IDI and their prospective customers. Defendants were, and are, aware of these relationships, in that Johns has wrongfully disclosed to Defendants confidential customer and trade secret information including, without limitation, the identities of existing and prospective customers, client leads and contact information, and information regarding the needs of prospective customers.

97. Defendants have used unlawful means, including the misappropriation and use of Hydroxyl's and IDI's confidential information, to solicit Hydroxyl's and IDI's prospective customers, and to lure them away from Hydroxyl and IDI and induce them to do business with AnoxKaldnes.

98. As a direct and proximate result, Hydroxyl and IDI have lost business and suffered damages in the nature of past and future lost profits and costs of repairing relationships with their customers in an amount to be determined at trial.

99. Each of the aforementioned acts of Defendants was willful and malicious.

100. Defendants threaten to and, unless restrained, will continue to unlawfully solicit Hydroxyl's and IDI's prospective customers, and to disrupt the business relationships between Hydroxyl and IDI and their prospective customers, causing great and irreparable injury to Hydroxyl and IDI, for which damages would not afford adequate relief.

**NINTH CLAIM**

**Conspiracy**
**(by Hydroxyl and IDI against all Defendants)**

101. Hydroxyl and IDI repeat and reallege each and every allegation set forth in paragraphs 1 through ___, above, as though fully set forth at length.

102. In doing the things hereinabove alleged, Defendants knowingly and willfully conspired and agreed between themselves to deliberately disrupt Hydroxyl's and IDI's business through the unlawful misappropriation of Hydroxyl's and IDI's confidential information, the use of such proprietary information to wrongfully solicit employees and prospective customers of Hydroxyl and IDI, usurp business opportunities belonging to Hydroxyl and IDI and divert existing and prospective clients to AnoxKaldnes.

103. Defendants did the acts and things herein alleged pursuant to and in furtherance of the conspiracy.

104. AnoxKaldnes furthered the conspiracy by cooperating with, aiding and encouraging Johns and by offering Johns certain benefits if AnoxKaldnes was successful in soliciting Hydroxyl's and IDI's customers and employees, misappropriating Hydroxyl's and IDI's confidential information, and disrupting Hydroxyl's and IDI's business.

105. Overt acts in furtherance of the above-described conspiracy occurred when Johns abruptly left Hydroxyl's employ without notice that he was entering AnoxKaldnes' employ after denying that he was making such a move, and when Defendants solicited Hydroxyl's and IDI's

prospective customers, and/or misappropriated, used and/or disclosed Hydroxyl's and IDI's confidential information to do so.

106. As a proximate result of Defendants' wrongful acts pursuant to the conspiracy herein alleged, Plaintiffs have been damaged in an amount to be determined at trial.

107. The aforementioned acts of Defendants were willful and malicious.

**TENTH CLAIM**

**Unfair Competition**
**(by Hydroxyl and IDI against all Defendants)**

108. Hydroxyl and IDI repeat and reallege each and every allegation set forth in paragraphs 1 through ___, above, as though fully set forth at length.

109. As an employee of Hydroxyl, Johns had authorization to access some or all of Hydroxyl's and IDI's confidential information.

110. Upon information and belief, Defendants knew of this and deceptively and wrongfully worked to misappropriate and to induce Johns to misappropriate Hydroxyl's and IDI's confidential information to build up its business rather than to lawfully work to develop its customer base.

111. Upon information and belief, Defendants engaged in this behavior with the intention of profiting by advancing their own interests in their competition with Hydroxyl and IDI.

112. As a direct and proximate result of Defendants' conduct, Hydroxyl and IDI have suffered damages in an amount to be determined at trial.

## ELEVENTH CLAIM

**Violation of N.C. Gen. Stat. 75-1.1 (1977)**
**(by Hydroxyl and IDI against AnoxKaldnes Global A.B. and AnoxKaldnes, Inc.)**

113. Hydroxyl and IDI repeat and reallege each and every allegation set forth in paragraphs 1 through ____, above, as though fully set forth at length.

114. Hydroxyl and IDI compete with AnoxKaldnes for the sale of wastewater treatment products and services in the state of North Carolina.

115. The sale of wastewater treatment products and services is an activity in or affecting commerce.

116. AnoxKaldnes acted intentionally and in bad faith to induce Johns to violate the non-competition clause between Johns and Hydroxyl, to tortiously interfere with the contractual relationship between Hydroxyl and Johns, to misappropriate Hydroxyl's and IDI's trade secrets and confidential and proprietary information, and to tortiously interfere with Hydroxyl's and IDI's prospective business relations with customers in order to unfairly compete for the sale of wastewater treatment products and services in the state of North Carolina.

117. As a result of this unfair competition, AnoxKaldnes was able to procure at least one significant contract for the provision of wastewater treatment products and services in North Carolina that may have otherwise been awarded to Hydroxyl and/or IDI.

118. Defendants' actions were unscrupulous, and constitute unethical business dealing, in that they were unfair and deceptive and akin to pirating.

119. As a result of Defendants' actions Hydroxyl and IDI sustained monetary damages in the form of lost business opportunities in the state of North Carolina in an amount to be determined at trial.

**REQUEST FOR RELIEF**

WHEREFORE, Hydroxyl and IDI request that the Court enter judgment against the Defendants jointly and severally for:

A. Damages, including, but not limited to, compensatory, consequential, incidental damages in the amount exceeding $10,000,000, the full amount of which will be proven at trial, plus interest thereon at the legal rate until paid in full.

B. Punitive and exemplary damages in an amount sufficient to punish Defendants and deter future conduct of this type.

C. Treble damages for all compensatory consequential and incidental damages sustained by Hydroxyl and/or IDI as a result of lost business opportunities in North Carolina, pursuant to N.C. Gen. Stat. 75-16.

D. Injunctive relief, requiring Defendants, and their officers, directors, agents, attorneys, servants and employees, and all persons acting under, in concert, with, or for them:

(1) To refrain from using or disclosing Hydroxyl's trade secrets and confidential information;

(2) To refrain from using or disclosing IDI's trade secrets and confidential information;

(3) To return all materials constituting or embodying Hydroxyl's and/or IDI's trade secrets or confidential information, in whatever form or format, including, without limitation, hard copies and electronic data, to Hydroxyl or IDI;

(4) To refrain from unlawfully soliciting Hydroxyl's employees and/or interfering with their employment relationships with Hydroxyl; and

(5) To refrain from unlawfully soliciting any of Hydroxyl's and/or IDI's potential customer base.

E. Injunctive relief, enjoining the continued employment of Johns by AnoxKaldnes, Inc.

F. An accounting of all monies due and owing from Defendants, to Hydroxyl and/or IDI, and

G. The imposition of a constructive trust (i) requiring Defendants to hold all monies, tangible and intangible assets constituting the proceeds and profits

of their violations of duty to Plaintiffs and acts of unfair competition, and all products and proceeds thereof, in trust for Hydroxyl and IDI, (ii) declaring Hydroxyl and/or IDI the owner of the monies, assets and property interests described above, and all products and proceeds thereof, and (iii) granting possession of the above-described monies, assets and property interests, and all products and proceeds thereof, to Hydroxyl and/or IDI.

H. An award of costs and attorneys' fees, and

I. For such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 25, 2007
Providence, Rhode Island

HYDROXYL SYSTEMS, INC. and
INFILCO DEGREMONT, INC.,
By their Attorneys,

Geoffrey W. Millsom (#6483)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-2443
Tel: (401) 274-7200
Fax: (401) 351-4607/751-0604
gmillsom@apslaw.com

427774_4.doc